USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/13/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
NEW YORK DISTRICT COUNCIL OF          :
CARPENTERS PENSION FUND, et al.,      :
                                      :
                    Plaintiffs,       :          06 Civ. 6377 (WHP)(JCF)
                                      :
       -against-                      :          MEMORANDUM & ORDER
                                      :
PERIMETER INTERIORS, INC. and         :
SUSAN REIDY,                          :
                                      :
                    Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

            Plaintiffs, New York District Council of Carpenters Pension Fund and five

related funds (collectively, the "Benefit Funds"), bring claims pursuant to the Employees

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and the Labor

Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 152 et seq., against Defendants

Perimeter Interiors ("Perimeter") and its president, Susan Reidy ("Reidy"). By Memorandum &

Order dated February 13, 2009 ("February 2009 Memorandum & Order"), this Court granted

Plaintiffs' motion for summary judgment, and referred this action to Magistrate Judge James C.

Francis IV for a damages inquest. N.Y. Dist. Council of Carpenters Pension Fund v. Perimeter

Interiors, Inc., No. 06 Civ. 6377 (WHP), 2009 WL 362640 (S.D.N.Y. Feb. 13, 2009). On May

29, 2009, the Magistrate Judge issued a Report and Recommendation ("Report") recommending

that this Court award Plaintiffs a total of $2,508,324.84. Defendants object to the Report. For

the following reasons, this Court adopts the well-reasoned Report of Magistrate Judge Francis

and denies Defendants' objections.

## BACKGROUND

The underlying facts are set forth in the February 2009 Memorandum & Order. Following an inquest, Magistrate Judge Francis divided the checks drawn on Defendants' secret account at Country Bank into four categories of payables: (1) cash; (2) Speedy; (3) potential covered employees; and (4) Reidy. (Report at 8.) Magistrate Judge Francis held that Plaintiffs are entitled to fringe benefit contributions for all checks in the first three categories because they were for covered work under the parties' collective bargaining agreement ("CBA"). (Report at 8-15.) Specifically, Magistrate Judge Francis concluded that: (1) nineteen of the twenty checks payable to "cash" entitled Plaintiffs to fringe benefit contributions totaling $13,353.41;[1] (2) all checks used to pay 109 individuals other than Reidy entitled Plaintiffs to fringe benefit contributions of $740,071.42; and (3) thirteen checks payable to Speedy required a fringe benefit contribution of $601,848.78. (Report at 8-15.)

Defendants lodge three principal objections to the Report. First they argue that Plaintiffs did not demonstrate that the first three categories of checks represented payment for covered work under the CBA. Second, Defendants argue that the award of $244,791.25 in attorney's fees is excessive. Finally, they object to $40,670 in auditor's fees.

## DISCUSSION

### I. Standard of Review

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations" of a magistrate judge. 28 U.S.C. § 636(b)(1). This Court reviews de novo

---

[1] One check payable to "cash" was excluded because it was dated several months after all the others and contained a blank memo line. (Report at 11 n.6.)

those parts of the Report to which objections are made, and reviews the remainder for clear error

on the face of the record.  28 U.S.C. § 636(b)(1); Nelson v. Smith, 618 F. Supp. 1186, 1189

(S.D.N.Y. 1985).  "In addition, when a party makes only generalized or conclusory objections, or

simply reiterates his original arguments, the Court reviews a magistrate judge's report and

recommendation for clear error."  Fabricio v. Artus, No. 06 Civ. 2049 (WHP)(GWG ), 2009 WL

928039, at *1 (S.D.N.Y. Mar. 12, 2009).


## II. Covered Work

"Employers have an affirmative duty to 'furnish to benefit plans the information

needed for the plans' fulfillment of their reporting duties.'"  N.Y. City Dist. Council of

Carpenters Pension Fund v. Quantum Constr., No. 06 Civ. 13150 (GEL)(JCF), 2008 WL

5159777, at *2 (S.D.N.Y. Dec. 9, 2008) (quoting Cent. States, Southeast & Southwest Areas

Pension Fund v. Cent. Transport, Inc., 472 U.S. 559, 573 (1985)).  "Once a plaintiff . . .

produc[es] evidence that raises genuine questions about the accuracy of the employer's records

and the number of hours actually worked, the burden shifts to the employer to come forward

with evidence to counter the plaintiff's proffer regarding the precise amount of work performed."

Quantum, 2008 WL 5159777, at *2 (quotation marks omitted).

Magistrate Judge Francis found ample evidence that the checks payable to "cash,"

or Speedy, or the 109 individuals other than Reidy, were for covered work.  Reviewing the

record before the Magistrate Judge, this Court agrees with Magistrate Judge Francis's

conclusions and will not reiterate them here.  Cf. Quantum, 2008 WL 5159777, at *3 (court

declined to award damages with respect to 103 payees where "there [was] no evidence—either

direct or which a reasonable inference could be drawn—that [they] were carpenters, performed

3

covered work, or had any relationship to the plaintiff funds." (emphasis added)). This Court attaches a copy of the Magistrate Judge's Report & Recommendation to this Memorandum & Order and incorporates it by reference.

Defendants' reliance on Quantum, a case involving a default judgment, is misplaced. Under a default judgment scenario, "the allegations in the complaint with respect to the amount of damages are not deemed true." Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999) (emphasis added). In the present case, Plaintiffs are entitled to an adverse inference regarding Reidy's stipulated invocation of her Fifth Amendment right against self-incrimination to 268 separate questions, including questions about whether checks were used to pay for covered work. Moreover, there was ample evidence in the checks themselves, including endorsements on checks to cash by individuals who were clearly performing covered work.

III. Attorney's & Auditor's Fees

As Defendants acknowledge, their objections to the award of attorney's fees and auditor's fees are identical to their arguments to Magistrate Judge Francis. From my own experience with this case, this Court notes that a skilled defense team threw up every obstacle to Plaintiffs' counsel. Moreover, Reidy fled to Ireland and did everything in her power to obstruct the auditors. This Court does not find those awards or any other portion of the Report to be facially erroneous but notes one inconsequential $.06 arithmetic error concerning the calculation of principal damages. Accordingly, that portion of the award should be reduced from $1,355,273.67 to $1,355,273.61.

## CONCLUSION

For the foregoing reasons, this Court adopts Magistrate Judge Francis's well-

reasoned Report.  Plaintiffs are directed to submit a proposed judgment consistent with this

Memorandum & Order by August 24, 2009.

Dated:  August 13, 2009
        New York, New York

                                        SO ORDERED:

                                        WILLIAM H. PAULEY III
                                        U.S.D.J.

*Copies sent to:*
Magistrate Judge James C. Francis IV

*Counsel of Record:*

Joy Mele, Esq.
O'Dwyer & Bernstein, LLP
52 Duane Street
New York, NY 10007
*Counsel for Plaintiffs*

Terrence M. Randell, Esq.
Law Offices of Michael G. Dowd
112 Madison Avenue
New York, NY 10016
*Counsel for Defendants*

```
UNITED STATES DISTRICT COURT                    (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
THE NEW YORK DISTRICT COUNCIL OF    :   06 Civ. 6377 (WHP) (JCF)
CARPENTERS PENSION FUND, NEW YORK   :
CITY DISTRICT COUNCIL OF CARPENTERS:       REPORT AND
WELFARE FUND, NEW YORK CITY         :       RECOMMENDATION
DISTRICT COUNCIL OF CARPENTERS      :
VACATION FUND, NEW YORK CITY        :
DISTRICT COUNCIL OF CARPENTERS      :
ANNUITY FUND, NEW YORK CITY         :
DISTRICT COUNCIL OF CARPENTERS      :
APPRENTICESHIP, JOURNEYMAN          :
RETRAINING, EDUCATIONAL AND         :
INDUSTRY FUND, NEW YORK CITY        :
DISTRICT COUNCIL OF CARPENTERS      :
CHARITY FUND, by their Trustees     :
Michael J. Forde and Paul O'Brien,  :
and THE NEW YORK CITY AND VICINITY  :
CARPENTERS LABOR-MANAGEMENT         :
CORPORATION,                        :
                                    :
            Plaintiffs,             :
                                    :
    - against -                     :
                                    :
PERIMETER INTERIORS, INC. and       :
SUSAN REIDY,                        :
                                    :
                                    :
            Defendants.             :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE WILLIAM H. PAULEY III, U.S.D.J.:
```

This action is brought pursuant to Sections 502 and 515 of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. §§ 1132 and 1145, and Section 301 of the Labor-Management

Relations Act of 1947 (the "Taft-Hartley Act"), 29 U.S.C. § 185.

The plaintiffs are employee benefit funds (collectively, the

"Funds") that seek damages stemming from the failure of Perimeter

Interiors, Inc. ("Perimeter") and Susan Reidy, Perimeter's

President and sole shareholder, to pay contributions to the Funds as required under a collective bargaining agreement. Summary judgment was granted for the plaintiffs, and the case was referred to me for an inquest on damages.

## Background

Perimeter was a carpentry business owned and operated by Susan Reidy. (Plaintiffs' 56.1 Statement dated Aug. 15, 2008 ("Pl. 56.1 Stmt."), ¶¶ 7-8). The Funds are jointly-administered, multi-employer employee benefit plans under § 302(c)(5) of the Taft-Hartley Act, and §§ 3(1), 3(2), 3(3) 3(37), 515, and 5029(d)(1) of ERISA. (Pl. 56.1 Stmt., ¶¶ 1-3). On July 1, 2001, Perimeter signed a collective bargaining agreement (the "CBA") with the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "Union"). (Pl. 56.1 Stmt., ¶¶ 9-10. Effective through June 30, 2006, the CBA required Perimeter to make certain agreed-upon contributions for fringe benefits to the Funds for each hour worked by carpenters performing work covered by the CBA. (Independent Building Construction Agreement, attached as Exh. 4 to Declaration of Joy K. Mele dated March 20, 2009 ("Mele Decl."), art. XV, §1).

Under the CBA, Perimeter was obligated to notify the Union when it sent carpenters to perform covered work so that a shop steward could be assigned to the job site to record the number of hours worked. (Pl. 56.1 Stmt., ¶ 30). Ms. Reidy was aware that

2

these notifications were necessary for the Union to calculate the necessary fringe benefit contributions. (Pl. 56.1 Stmt., ¶¶ 28-29). The CBA authorized the Union trustees to audit Perimeter's books and records to ensure that the proper fringe benefit contributions were being paid. (CBA, art. XV, § 1).

In 2005, the Funds retained Gregory Polvere to conduct an audit of Perimeter. (Declaration of Gregory J. Polvere dated Aug. 13, 2008 ("Polvere Decl.") attached as Exh. 5 to Mele Decl., ¶¶ 5, 7). Mr. Polvere informed Ms. Reidy of the audit in August 2005, and she referred him to her accountant, Damien Sweeney. (Polvere Decl., ¶¶ 7-8). On October 19, 2005, Mr. Polvere conducted the audit at Mr. Sweeney's office, but was not allowed access to Perimeter's bank records. (Polvere Decl., ¶¶ 8, 9). By this time, Mr. Polvere was apparently aware that Perimeter had three bank accounts, two of which were acknowledged by Perimeter and a third that it tried to keep secret.[1]  Although Mr. Sweeney denied knowledge of the secret account during the audit, the Funds knew that checks were being written from a Country Bank account and subsequently obtained the account records by subpoena. (Polvere Decl., ¶¶ 10-11).

The Country Bank records revealed that 1,433 checks were written to 111 different recipients from the account. (Polvere

---

[1] There is no explanation in the record of how Mr. Polvere became aware of the "secret" account.

3

Decl., ¶ 22). Ms. Reidy and Speedy Enterprises ("Speedy"), a non-union company that was owned by Ms. Reidy's husband, were among the recipients. (Expert Report of Gregory Polvere dated April 8, 2008 ("Polvere Report"), attached as Exh. 6 to Mele Decl., at 12, 19). The plaintiffs allege that these checks were used to pay workers' wages without detection by the Union, in violation of the CBA. (Plaintiffs' Proposed Findings of Fact ("Pl. Findings"), ¶¶ 30-34).

The plaintiffs filed a complaint on August 22, 2006, seeking an order compelling the defendants to pay the contributions owed as well as monetary damages stemming from the alleged fraud. (Complaint, ¶ 1). Although Ms. Reidy was required under ERISA to "maintain records with respect to each of [her] employees sufficient to determine the benefits due or which may become due to such employees," she failed to produce any business records during the discovery process.  29 U.S.C. § 1059(a)(1).  Ms. Reidy's attorney explained that "whatever relevant documents that existed prior to August, 2006 were not retained." (Supplemental Response to Plaintiffs' Several Document Demands, ¶ 4).

The plaintiffs then sought to depose Ms. Reidy, but she declined to answer any questions. In a written stipulation between the parties, Ms. Reidy asserted that she would invoke her Fifth Amendment right against self-incrimination, and the plaintiffs agreed to withdraw their deposition notice. (Stipulation and Order dated May 28, 2008 ("Stip.") at 2-3). In lieu of conducting the

4

deposition, the plaintiffs attached to the stipulation a list of the 268 questions that they would have asked her. (Schedule A, attached to Stip.).

When it became clear that the defendants would not present documents and Ms. Reidy would not testify, the Honorable William H. Pauley III, U.S.D.J., granted summary judgment for the plaintiffs. Judge Pauley determined that the plaintiffs had established liability, concluding that the defendants "maintained the Secret Account to avoid their legal obligations to the Benefit Funds." New York District Council of Carpenters Pension Fund v. Perimeter Interiors, Inc., No. 06 Civ. 6377, 2009 WL 362640, at *4 (S.D.N.Y. Feb. 13, 2009). He then referred the matter to me to calculate damages.

Discussion

A. Damages

Judge Pauley determined the fact of damages, though not necessarily in the amounts claimed by the Funds. I must decide which payments from the secret account represent work covered under the Agreement, and thus for which payments fringe benefit contributions were wrongfully withheld. The Funds assert that the defendants have the burden of proving that the checks did not relate to covered work because they failed to keep proper records. (Pl. Findings, ¶ 38). Indeed,

> once a plaintiff establishes his prima facie case by
> producing evidence that raises genuine questions about

5

the accuracy of the employer's records and the number of
hours actually worked, the burden shifts to the employer
to come forward with evidence to counter the plaintiff's
proffer regarding the precise amount of work performed.

New York City District Council of Carpenters Pension Fund v.
Quantum Construction, No. 06 Civ. 13150, 2008 WL 5159777, at *10
(S.D.N.Y. Dec. 9, 2008) (citations and quotation marks omitted).
The plaintiffs must, however, present evidence beyond mere
speculation to prove that the defendants owe contributions for
fringe benefits. Id. at *11.

To be entitled to the amount claimed, the plaintiffs must
first meet the threshold burden of proof by "produc[ing] evidence
that raises genuine questions about the accuracy of the employer's
records and the number of hours actually worked" with regard to
each individual paid by Perimeter and Speedy. Local 282 Welfare
Trust Fund v. A. Morrison Trucking, Inc., No. 92 CV 2076, 1993 WL
120081, at *1 (E.D.N.Y. March 30, 1993). Then the burden shifts to
the defendants to produce "evidence of the precise amount of work
performed, or evidence that the assumptions underlying the audit
are incorrect." Id. (citations and quotation marks omitted).

The plaintiffs have provided a considerable amount of evidence
demonstrating that the secret account was used exclusively to pay
for covered work. Citing Quantum, the defendants counter that the
plaintiffs "must show that the payees from Perimeter's Country Bank
account either were (1) included in a prior audit as having
performed covered work; or (2) had benefit contributions made to

6

the benefit funds for them by Perimeter; or (3) appeared on
Perimeter shop steward reports." (Defendants' Proposed Findings of
Fact and Conclusions of Law ("Def. Findings"), ¶ 32) (citing
Quantum, 2008 WL 5159777, at *2).    Although the defendants
correctly note the standards applied in Quantum, they fail to
recognize that Quantum is distinguishable from the instant case; as
explained below, it is unnecessary here to present proof identical
in kind to that relied upon in Quantum .

    The plaintiffs have demonstrated that most of the checks
written from the secret account contain language insinuating that
they were used for wages, that no checks were made for materials
and supplies, that most documented wages paid by Perimeter were for
covered work, and that many individuals paid from the Country Bank
account were previously paid for covered work.   Furthermore, the
plaintiffs "are entitled to an adverse inference in connection with
much of the information they sought" from the deposition of Susan
Reidy.   Perimeter, 2009 WL 362640, at *4.

    Additionally, the defendants have shown a considerable lack of
credibility.    Ms. Reidy has admitted to intentionally causing
Perimeter to communicate false reports omitting covered employees
for her own financial gain. (Pl. 56.1 Stmt., ¶ 35). As previously
noted, she also failed to maintain records as expressly required
under ERISA.   Finally, she also refused to testify to any one of
the 268 questions prepared by the defendants

7

All of these factors are relevant to inferring the nature of the checks written from the Country Bank account. These checks fell into four categories, depending on the payee. Some checks were made out to "Cash," others were paid directly to individuals, some were paid to Speedy Enterprises, and the rest were written to Susan Reidy.[2] The plaintiffs maintain that all four categories of checks were used to pay for covered work, asserting that Judge Pauley has already determined that the Country Bank account existed for the purpose of evading fringe benefit contributions. (Pl. Findings, ¶ 47).

### 1. Checks to "Cash"

The plaintiffs contend that twenty checks made out to "Cash" were used to pay wages for covered work. (Pl. Findings, ¶ 15). The checks totaled $14,896.36, and were written somewhat sporadically and in varying amounts between September 11, 2002 and July 28, 2005. (Cash Disbursements from Perimeter Account ("Disbursements"), attached to Polvere Report, at 6-7). In support of their allegation, the plaintiffs note that many checks were endorsed by persons other than Ms. Reidy (Pl. Findings, ¶ 15; Country Bank Records, Plaintiffs' Exh. 1 at April 13, 2009 Hearing), and the memo lines of certain checks appear to show hours of work. (Pl. Findings, ¶ 15; Polvere Decl., ¶ 24). While similar evidence was deemed too "speculative" in Quantum to attribute

---

[2] Some checks made out to Susan Reidy from the Country Bank account referred to her as Susan Mulligan, her married name.

8

checks to covered work, see Quantum, 2008 WL 515977, at *9, here
there is sufficient corroborative evidence to meet the plaintiffs'
burden.

First, the defendants are entitled to an adverse inference on
the 268 questions that Ms. Reidy declined to answer, including
questions about whether the checks made out to "Cash" were used to
pay for covered work. (Schedule A, ¶ 89-90). Second, the numbers
listed on the memo lines of many of the checks, which the
plaintiffs allege represent hours worked by the recepiant, are
relatively proportional to the check totals.[3]  Third, as was noted
earlier, Judge Pauley decided that this bank account was set up to
defraud the defendants. Finally, the endorsement on Check #899 is
clearly that of Thomas Neary, a worker previously paid by Perimeter
for covered work. (Perimeter Remittance Reports attached as Exh.
11 to Pl. Findings, at 33-38). When considered in full, this
evidence tips the scale in favor of the plaintiffs. The checks
made to "Cash" that contain either an endorsement other than Ms.
Reidy's, or a memo line or dollar amount indicating an hourly wage,
will thus be considered to have been used to pay for covered wages.
The hours and fringe benefit contributions[4] calculated therefrom

_____

[3] Dividing the total of each check by the number in the memo
line gives a number between 20 and 25, presumably the hourly wage
paid "under-the-table" for that particular job.

[4] The fringe benefit contributions due are calculated using
periodic rates proposed by the plaintiffs. The rates represent the
lowest level of union worker beyond an apprentice. Considering the
lack of information provided by the defendants, these rates are

9

are shown below:[5]

| Date | Check # | Total | Hourly Rate | Hours | Fringe Rage | Contributions Due |
|------|---------|-------|-------------|-------|-------------|-------------------|
| 09/02 | 322 | $175.00 | $25.00 | 7 | $24.91 | $174.37 |
| 11/02 | 191 | $575.00 | $25.00 | 23 | $24.91 | $572.93 |
| 01/03 | 1259 | $770.00 | $22.00 | 35 | $24.91 | $871.85 |
| 08/03 | 898 | $1000.00 | $25.00 | 40 | $26.31 | $1052.40 |
| 08/03 | 899 | $1000.00 | $25.00 | 40 | $26.31 | $1052.40 |
| 09/03 | 999 | $414.00 | $23.00 | 18 | $26.31 | $473.58 |
| 09/03 | 1000 | $1100.00 | $25.00 | 44 | $26.31 | $1157.64 |
| 11/03 | 1163 | $161.00 | $23.00 | 7 | $26.31 | $184.17 |
| 12/03 | 1197 | $858.00 | $22.00 | 39 | $26.31 | $1026.09 |
| 12/03 | 1199 | $875.00 | $25.00 | 35 | $26.31 | $920.85 |
| 12/03 | 1209 | $525.00 | $25.00 | 21 | $26.31 | $552.51 |
| 12/03 | 1213 | $308.00 | $22.00 | 14 | $26.31 | $368.34 |
| 12/03 | 1224 | $770.00 | $22.00 | 35 | $26.31 | $920.85 |
| 12/03 | 1225 | $440.00 | $22.00 | 20 | $26.31 | $526.20 |
| 12/03 | 1228 | $280.00 | $20.00 | 14 | $26.31 | $368.34 |
| 12/03 | 1241 | $462.00 | $22.00 | 21 | $26.31 | $552.51 |
| 01/04 | 1276 | $1034.00 | $22.00 | 47 | $26.31 | $1236.57 |
| 01/04 | 1283 | $1056.00 | $24.00 | 44 | $26.31 | $1157.64 |
| 03/04 | 1434 | $91.00 | $13.00 | 7 | $26.31 | $184.17 |

undoubtedly fair.

[5] To calculate the number of hours paid for by the checks that do not include a number on the memo line, the total amount of the check is divided by the highest hourly rate that produces a rounded-off number of hours. The highest hourly rate found on these checks was $25.00, so the highest hourly wage at or below $25.00 that fits evenly into a check's total will be used to calculate the number of hours covered by that check.

| | Total | $11,894 | | 511 | | $13,353.41 |
|---|---|---|---|---|---|---|

_____The plaintiffs are entitled to $13,353.41 in fringe benefit contributions from the checks made out to "Cash."[6] _____

### 2. Checks to Individuals

Checks from Perimeter's Country Bank account were used to pay 109 individuals other than Ms. Reidy.  (Polvere Decl., ¶ 22; Polvere Report at 19).  The plaintiffs allege that all of these checks were used to pay for covered work, although only 17 of the payees were on Perimeter's steward reports.  (Pl. Findings, ¶ 15). The defendants argue that it would be too speculative to conclude that random individuals performed covered work for Perimeter. (Def. Findings, ¶ 32).  For the same reasons discussed above, however, the evidence as a whole is sufficient for the plaintiffs to meet their threshold burden.   The defendants have produced nothing, have refused to answer a single question, have set up a bank account to defraud the plaintiffs, and have written checks to individuals who previously performed covered work.  The burden has therefore shifted to the defendants, who offer no substantial evidence in response.  Consequently, fringe benefit contributions are owed for all 109 individuals.    The wages paid to these

---

[6] Check #1186 has been left out of this calculation.   This check was written several months after the rest and it contained a blank memo line.  Additionally, it was made out for the peculiar sum of $3,002.36, while the other amounts were in rounded off numbers that indicate tax-free wages.  (Polvere Report at 17).   It would be too speculative to assume that this check was also used to pay for covered work.

11

individuals totals $1,090,188.92,[7] and the total contributions due on these payments is $740,071.42.[8]

### 3. Checks to Speedy Enterprises

Ms. Reidy wrote 13 checks totaling $822,756.00 to Speedy Enterprises, a business owned and operated by her husband. (Polvere Report at 16, 19). This comprises most of the money ever deposited into Speedy's bank account, which was also with Country Bank. (Polvere Decl., ¶ 38). Speedy Enterprises and Mr. Mulligan, are not parties to this action, however. Rather, Speedy is a non-union company that has not signed the Union's CBA. (Pl. Findings, ¶ 19). Accordingly, in order to recover on the payments made to Speedy, the plaintiffs must show that Speedy was an "alter ego" of Perimeter, paying for covered work that would otherwise be paid for by Perimeter. See Puccio v. L.M.G. Air Corporation, No. 94 Civ. 4013, 1998 WL 887008, at *6 (E.D.N.Y. Dec. 8, 1998) ("The alter ego doctrine 'provides an analytical hook to bind a non-signatory to a collective bargaining agreement.'" (quoting Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co., 944 F.2d 1037, 1046 (2d Cir. 1991)).

---

[7] This amount can be calculated either by adding the checks paid to the individuals or by taking the total of the payments made to the Country Bank account and subtracting the checks paid to Ms. Reidy, to Speedy, and to "Cash."

[8] This figure is based on calculations performed by Mr. Polvere and documented in the chart of disbursements attached to his expert report. It takes into account the periodic changes in fringe benefit rates but does not include interest.

12

If Speedy and Perimeter are found to be alter egos, then both will be bound by the CBA. See Lihli Fashions Corp., Inc. v. NLRB, 80 F.3d 743, 748 (2d Cir. 1996). Two businesses are alter egos if they have "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." Id. (citation and quotation marks omitted); see also Plumbers, Pipefitters and Apprentices Local Union No. 112 Pension, Health and Educational and Apprenticeship Plans v. Mauro's Plumbing, Heating and Fire Suppression, Inc., 84 F. Supp. 2d 344, 349-51 (N.D.N.Y. 2000) (applying factors to find that two companies were alter egos and both liable to Union though one never signed CBA). "No one factor is controlling, and all need not be present to support a finding of alter ego status." C.E.K. Industrial Mechanical Contractors, Inc. v. N.L.R.B., 921 F.2d 350, 354 (1st Cir. 1990).

Many of these factors are present in this case and support the plaintiffs' assertion that Perimeter and Speedy are alter egos of one another. For example, Speedy's accountant, Mr. Sweeney, testified that Ms. Reidy was his primary contact at Speedy. (Deposition of Damien Sweeney ("Sweeney Dep."), Plaintiffs' Exh. 21 at April 13, 2009 Hearing, at 107). Mr. Sweeney stated that he spoke to Ms. Reidy because he "[didn't] think Jerry Mulligan would know what the hell we're talking about from a general ledger point of view." (Sweeney Dep. at 107). With regard to Speedy's tax returns, Mr. Sweeney testified that Ms. Reidy "provided everything." (Sweeny Dep. at 108). Furthermore, the two companies

13

had 30 employees in common, even though Speedy employed a total of only 73 employees. (Pl. Findings, ¶ 24). See Plumbers, Pipefitters and Apprentices, 84 F. Supp. 2d at 351 (finding 20% overlap in employees sufficient to support finding of alter-ego, given additional evidence). Finally, approximately 69% of the money ever deposited into Speedy's Country Bank account came directly from Perimeter's concealed account. (Polvere Decl., ¶ 38). In sum, the companies' management, supervision, employees, business purpose, and ownership are strikingly similar, and the two companies are thus alter egos of one another. Checks made to individuals from Speedy's account will therefore be considered to have been paid from Perimeter's account.

In calculating contributions owed, the checks made out to "Cash" from Speedy's account will be counted for the same reasons such checks from Perimeter's account were included. Although the endorsements do not appear in the bank records, pay periods are clearly listed on the memo lines. This, when combined with the adverse inference against Ms. Reidy with regard to deposition questions she refused to answer about Speedy, is sufficient to meet the threshold burden to demonstrate that fringe benefit contributions are owed in connection with these monies. Because the defendants have not introduced any contrary evidence, all of the checks made from Perimeter's Country Bank account to Speedy will be considered payments for work covered by the CBA.

While this calculation may be inexact, "it is not required

14

that damages be proved with mathematical exactness provided that there is reasonable data from which the amount of damages can be ascertained with reasonable certainty, and the party who has caused the loss may not insist on theoretical perfection." Maritime & Mercantile International, LLC v. United States, No. 02 Civ. 1446, 2007 WL 690094, at *43 (S.D.N.Y. Feb. 28, 2007) (citations and quotation marks omitted). Since the total paid from the Speedy account was $822,756.00, fringe benefit contributions owed equal $601,848.78.[9]

### 4. Checks to Susan Reidy

A total of $368,000 worth of checks were made out from Perimeter's Country Bank account to Ms. Reidy. (Polvere Report at 15). The plaintiffs allege that this money was used to pay cash wages in an effort to avoid paying fringe benefits to the Union, noting that Ms. Reidy was taking a separate salary from Perimeter. (Pl. Findings, ¶ 59). The plaintiffs are entitled to an adverse inference against Ms. Reidy regarding a question that asked if she had written checks to herself to pay wages for covered work (Schedule A, ¶ 87), but this inference, standing alone, is insufficient for the plaintiffs to meet their burden.

To begin with, a business owner found to have deliberately committed fraud in order to realize "an unjustified windfall," Perimeter, 2009 WL 362640, at *5, is at least as likely to have

---

[9] Again, this figure is taken from Mr. Polvere's calculations.

done so for the purpose of evading taxes as evading fringe benefit
contributions.    It is clear that Ms. Reidy paid workers off the
books by writing checks to them directly from the secret account
and from Speedy's bank account and by giving workers checks made
out to "Cash."   There is no logical reason for her to first write
checks to herself when she had various other avenues by which to
pay the workers.   Additionally, there is no apparent connection
between these checks and any carpenters performing covered work;
rather it seems that Ms. Reidy simply paid herself extra amounts in
unreported income.   Fringe benefit contributions are therefore not
due from this money.

### B. Prejudgment Interest

Under the CBA, if delinquent contributions to the Funds are
recovered in court, interest is to be awarded in the amount of the
Citibank prime rate plus 2%.   (CBA, Art. XV, § 6(a)(2)).   However,
the plaintiff's suggested calculations are  slightly flawed.   The
plaintiffs' method of computing the interest designates an accrual
period of January 1, 2002 through December 31, 2005.    (Accrued
Interest Charges ("AIC") attached as Exh. 18 to Declaration of Joy
K. Mele dated April 20, 2009 ("Mele 4/20/09 Decl."), ¶ 28).
However, the checks actually ranged from April 2, 2002 through
November 25, 2005. (Disbursements).   The midpoint of the correct
accrual range is January 29, 2004. This date is appropriately used
as the starting point for interest calculations. See Quantum, 2008
WL 5159777, at *12; Doo Nam Yang v. ACBL Corp.,   427 F. Supp. 2d

16

327, 342 (S.D.N.Y. 2005).

The plaintiffs are entitled to interest on the principal sum of \$1,355,273.67, at Citibank's prime rate plus 2% from January 29, 2004. The total amount is shown in the table below.

| Principal | Time Period | Rate | Daily Rate | Total |
|-----------|-------------|------|------------|-------|
| \$1,355,273.67 | 1/29/04 - 6/04 | 6.0% | 0.0164% | \$34,228.79 |
| \$1,355,273.67 | 7/04 - 12/04 | 6.25% | 0.0171% | \$42,642.33 |
| \$1,355,273.67 | 1/05 - 6/05 | 7.25% | 0.0199% | \$48,815.60 |
| \$1,355,273.67 | 7/05 - 12/05 | 8.25% | 0.0226% | \$56,357.70 |
| \$1,355,273.67 | 1/06 - 6/06 | 9.25% | 0.0253% | \$62,062.05 |
| \$1,355,273.67 | 7/06 - 12/06 | 10.25% | 0.0281% | \$70,073.07 |
| \$1,355,273.67 | 1/07 - 6/07 | 10.25% | 0.0281% | \$68,930.57 |
| \$1,355,273.67 | 7/07 - 12/07 | 10.25% | 0.0281% | \$70,073.07 |
| \$1,355,273.67 | 1/08 - 6/08 | 9.25% | 0.0253% | \$62,404.93 |
| \$1,355,273.67 | 7/08 - 12/08 | 7.0% | 0.0192% | \$47,879.11 |
| \$1,355,273.67 | 1/09 - 5/26/09 | 5.25% | 0.0144% | \$28,493.27 |
| **Total** | | | | **\$591,960.49** |

The prejudgment interest, in accordance with the CBA, is \$591,960.49. For every day the principal is unpaid from May 26, 2009 through June 30, 2009, the interest grows by \$194.94. After June 30, the new Citibank rate will need to be factored into the calculation.

C. Liquidated Damages

The CBA also provides for additional compensation equal to either the amount of prejudgment interest calculated or 20% of the principal damages. (CBA, art. XVI, § 6(3)). The plaintiffs

17

requested the latter form of relief (Pl. Findings, ¶ 76), and are thus entitled to $271,054.73 in liquidated damages.

### D. Attorneys' Fees and Costs

Finally, the plaintiffs seek an award of reasonable attorneys' fees and costs pursuant to ERISA. 29 U.S.C. § 1132(g)(2); see also Demopoulos v. Mystic Tank Lines Corp., No. 07 Civ. 9451, 2008 WL 4596274, at *5 (S.D.N.Y. Oct. 16, 2008) ("When a plaintiff prevails in an ERISA action for unpaid contributions, an award of attorneys' fees and costs under ERISA § 502(g)(2)(D) is mandatory"). The plaintiffs' attorneys claim to have spent 780.9 hours working on the case, for which they seek a total of $244,791.25 in fees. (Mele 4/20/09 Decl., ¶¶ 11, 15). They also claim costs totaling $4,574.70 that are not in dispute. (Mele 4/20/09 Decl., ¶ 16).

The standards for evaluating a fee application are well established.

> In calculating attorney's fee awards, district courts use the lodestar method -- hours reasonably expended multiplied by a reasonable hourly rate. See A.R. ex rel. R.V. v. New York City Dept. of Ed., 407 F.3d 65, 79 (2d Cir. 2005); see Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1058 (2d Cir. 1989). In order to calculate the reasonable hours expended, the prevailing party's fee application must be supported by contemporaneous time records, affidavits, and other materials. See Chambless, 885 F.2d at 1058; New York State Ass'n for Retarded Childen v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983). A district court may exercise its discretion and use a percentage deduction "'as a practical means of trimming fat from a fee application,'" Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (quoting Carey, 711 F.2d at 1146), and the Supreme Court has been careful to note that only those hours "reasonably expended" are to be awarded. See Hensley v. Eckerhart, 461 U.S. 424, 434-35 (1983).

18

McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450
F.3d 91, 96 (2d Cir. 2006) (per curiam).

Although the defendants have pointed out alleged flaws in the
attorneys' fees invoice, their arguments are meritless.    For
example, the defendants note that the date on the top of the
plaintiffs' fee invoice is April 16, 2009, and they suggest that
counsel's fees were formulated on that date. (Letter of Terrence
M. Randell dated April 27, 2009 ("Randell Letter") at 2). However,
there is nothing in the record to suggest that this date is
anything but the date on which the hours were summarized for the
Court's convenience.   The defendants also assert that the invoice
"contains no rates or dollar amounts" (Randell Letter at 3);
however, the suggested rates are clearly laid out in counsel's
declaration.  (Mele 4/20/09 Decl., ¶ 12). See Cablevision Systems
New York City Corp. v. Diaz, No. 07 Civ. 4340, 2002 WL 31045855, at
*5 (S.D.N.Y. July 10, 2002) (noting that request for attorneys'
fees should include time records with attorneys' names, dates,
hours expended, and nature of work done).

Next, the defendants' claim that many tasks in the invoice
took "excessive" time to complete, including preparation of the
plaintiffs' summary judgment memorandum.    (Randell Letter at 3).
To determine the number of compensable hours, a court "must
initially look to the amount of time spent on each category of
tasks, as documented by contemporaneous time records" of each

19

attorney. Kuper v. Empire Blue Cross & Blue Shield, No. 99 Civ. 1190, 2003 WL 23350111, at *11 (S.D.N.Y. Dec. 18, 2003). In calculating the number of reasonable hours, the court may rely on its own familiarity with the case and the evidentiary submissions and arguments of the parties. Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992). Upon inspection of the documents and the time records, the time spent on the listed tasks seems reasonable.

Attorneys' fees must be calculated using reasonable hourly rates.

> A reasonable hourly rate is a rate "in line with . . . prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984); Chambless, 885 F.2d at 1058-59. A district court may also use its knowledge of the relevant market when determining the reasonable hourly rate. See Miele v. New York State Teamsters Conference Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir. 1987).

McDonald, 450 F.3d at 96-97; see also Lynch v. Town of Southampton, No. 05 Civ. 4499, 2007 WL 1876501, at *12 (E.D.N.Y. Jun. 27, 2007). Here, the rates suggested by the plaintiffs' attorneys -- $425.00 per hour for partners, $300.00 per hour for associates, and $150 per hour for paralegals -- meet these criteria and are identical to the rates awarded to the same firm in Quantum. See Quantum, 2008 WL 5159777, at *13; see also Sheehan v. Metropolitan Life Insurance Co., 450 F. Supp. 2d 321, 329 (S.D.N.Y. 2006) (approving same rates). Accordingly, attorneys' fees are calculated as follows:

20

| Name | Hours | Rate | Total |
|------|-------|------|-------|
| Brian O'Dwyer | 9.2 | $425.00 | $3,910.00 |
| Gary Silverman | 75.85 | $425.00 | $32,236.25 |
| Gary Rothman | 19.4 | $425.00 | $8,245.00 |
| Andrew GraBois | 8 | $300.00 | $2,400.00 |
| Jason Fuiman | 109.05 | $300.00 | $32,715.00 |
| Joy Mele | 542.5 | $300.00 | $162,750.00 |
| Ian Henderson | 2.5 | $150.00 | $375.00 |
| Richard Gage | 14.4 | $150.00 | $2,160.00 |
| **Total** | 780.9 | | $244,791.25 |

E. Auditor's Fees

The plaintiffs also seek compensation for their auditor, Mr. Polvere, who asserts that his total fees amount to $40,670.00. (Declaration of Gregory J. Polvere dated April 16, 2009, ¶ 5). Under ERISA, courts may award additional relief as they see fit. 29 U.S.C. § 1132(g)(2)(E); see also Mason Tenders District Council v. Aurash Construction Corp., No. 05 Civ. 1891, 2006 WL 647884, at *4 (S.D.N.Y. March 15, 2006) (awarding audit costs under ERISA). Mr. Polvere's fee appears to accurately reflect his extensive work on this case, and the plaintiffs shall therefore be awarded the requested amount of $40,670.00.

Conclusion

For the reasons stated above, I recommend that judgment be entered in favor of the plaintiffs and against the defendants, jointly and severally, for $1,355,273.67 in principal damages, $591,960.49 in prejudgment interest through May 26, 2009,

21

Case 1:06-cv-06377-WHP-JCF  Document 90  Filed 05/29/2009  Page 22 of 22
$2,717,034.73 in liquidated damages, $244,791.25 in attorneys' fees,
and $45,244.70 in other costs, for a total of $2,508,324.84.
Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of
the Federal Rules of Civil Procedure, the parties shall have ten
(10) days from this date to file written objections to this Report
and Recommendation.  Such objections shall be filed with the Clerk
of the Court, with extra copies delivered to the chambers of the
Honorable William H. Pauley III, Room 2210, and to the chambers of
the undersigned, Room 1960, 500 Pearl Street, New York, New York
10007.  Failure to file timely objections will preclude appellate
review.

                    Respectfully submitted,

                    JAMES C. FRANCIS IV
                    UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          May 29, 2009

Copies mailed this date to:

Joy K. Mele, Esq.
O'Dwyer & Bernstien, LLP
52 Duane Street
New York, New York 10007

Terrence M. Randell, Esq.
Law Office of Michael G. Dowd
112 Madison Avenue, 3rd Floor
New York, New York, 10016